William R. BENNETT, et al., Plaintiffs,

v.

BEHRING CORPORATION, et al., Defendants.

No. 72–886–CIV–JAG.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

March 12, 1982.

See also, D.C., 466 F.Supp. 689.

Haddad, Josephs & Jack, Coral Gables, Fla., Krupnick & Campbell, P.A. by Jon E. Krupnick, Fort Lauderdale, Fla., John P. Freeman, Harry A. Swagart, III, and Kennedy & Price, Columbia, S.C., for plaintiffs.

Max Bloomberg, pro se.

Howard L. Visnick, Fort Lauderdale, Fla., for defendants Stephen, Marjery & Albert Arent, Henry J. Fox, and Behring Corp.

Maurice W. Garcia, Hollywood, Fla., George I. Platt, Fort Lauderdale, Fla., Susan Goldman, Miami, Fla., for defendant Behring Corp.

James L. Case, Lauderdale-By-The-Sea, Fla., for defendants Henriette Blinder, Henry J. Fox, Charlotte Fox, Abe L. Blinder and Behring Corp.

George I. Platt, Schlichte, Carbo & Platt, P.A., Fort Lauderdale, Fla., for defendants Violet & Ray Huetteman on behalf of residential lot owners in Mainlands of Tamarac Lakes 7th Section; Mainlands 7 Maint. Corp., Inc.; Sunset Isle Maint. Corp.; John & Sylvia Assenzio on behalf of residential lot owners in the Mainlands of Tamarac Lakes Unit 13; Vanguard Village in the Mainlands Community 2 Assoc., Inc.; Westwood 6 Community Assoc., Inc.; Westwood 5 Community Assoc., Inc.; Woodlands Section 2, Phase 1 Assoc., Inc.; Woodlands One Assoc., Inc.; Woodlands Section 5 Assoc., Inc.; Woodlands Section 6 Assoc., Inc.; Woodlands Section Seven Assoc., Inc.; Woodlands Homeowners Assoc., Section 8, Inc.; Woodlands Homeowners Assoc., Inc. & Paul Linz and Rose Linz, individually, residential lot owners in the Woodlands.

Abrams, Anton, Robbins, Resnick, Schneider & Mager, P.A. by Maurice M. Garcia, Hollywood, Fla., for defendant Schecter.

Joseph A. Hubert, Fort Lauderdale, Fla., for defendants Jack and Dorothy Najor, and George H. and Georgette Najjar.

Houston, Faircloth, Cooper & Easthope by Joseph Easthope, Fort Lauderdale, Fla., for defendant Jacob Lutz.

Arthur W. Tifford, Miami, Fla., for plaintiffs Charles & Ida Diamond.

Jack Najor, pro se.

## MEMORANDUM OPINION AND FINAL ORDER OF DISMISSAL APPROVING CLASS ACTION SETTLEMENT AND DISMISSING THIS ACTION AS TO SETTLING DEFENDANTS

GONZALEZ, District Judge.

THIS CAUSE is before the Court on the Joint Motion of Plaintiffs and all Defendants except Jack and Dorothy Najor, George Mercier and Jacob Lutz for approval of a class action settlement pursuant to Rule 23 of the Federal Rules of Civil Procedure.

The court has heretofore entered a Preliminary Approval Order of Class Action Settlement, and, pursuant to said Preliminary Approval Order, has directed the Clerk of the Court to serve and publish Notice of the proposed settlement to all members of the Class. In accordance with the terms of said Order, the court, on September 25, 1981, held a hearing at which time all members of the class having objections to the proposed settlement were given an opportunity to be heard.

The court being now fully advised in the premises, does hereby grant final approval of the Agreement of Compromise and Settlement entered in this cause and, pursuant thereto, does enter this Final Order of Dismissal, said Final Order of Dismissal being predicated upon the entire record in the case and the findings of fact and conclusions of law set forth in this memorandum opinion.

The background of this lawsuit is set forth in this court's Memorandum Opinion and Order dated February 15, 1979, in which this court granted summary judgment for defendant Behring Corporation as to three Counts of the Amended Complaint. *See Bennett v. Behring Corporation,* 466 F.Supp. 689 (S.D.Fla.1979). The only count still pending is Amended Count VII by which the class members, numbering several thousand lot owners living in thirty-one (31) subdivisions located in the City of Tamarac, Florida, assert antitrust claims against thirty-six (36) defendants. The subdivisions in question embrace approximately 8,000 lots. After the class action notice was disseminated in 1979, over 2,000 class members opted out of the lawsuit. The class is represented by three Tamarac homeowners, Mr. and Mrs. William R. Bennett and Mr. Alexander Wagner. Included among the various defendants are Behring Corporation, which, along with various affiliated companies, developed the City of Tamarac and the Tamarac subdivisions in question; its corporate successors; Kenneth Behring, the controlling person of the corporate developer, and his wife; and various persons who now own or have owned Tamarac recreational facilities, one of which is located in each of the thirty-one (31) subdivisions.

In general, plaintiffs attack a land development practice used with some frequency in southern Florida during the late 1960's and early 1970's. During that period certain developers created residential communities, such as condominium developments or, as here, single family home subdivisions. These developments included various social and recreational amenities for the use of the subdivision residents. The social and recreational amenities were not conveyed in fee simple to home purchasers, but, pursuant to deed restrictions, were leased to the homeowners for a specified period of time. In the Tamarac subdivisions involved here, a clubhouse and swimming pool (hereinafter referred to as "recreational facilities") were constructed within each subdivision and deed restrictions obligated the purchaser of each home in the subdivision to the terms of a fifty (50) year lease agreement requiring the homeowners to (a) share in the maintenance of the recreational facilities, and (b) to make certain net leasing payments to the owner thereof. In many of the Tamarac subdivisions, the net rental payment obligation is subject to a cost of living index escalator clause.

Plaintiffs claim, in part, that the Tamarac development scheme amounted to a per se illegal tying arrangement and in other respects amounted to illegal concerted activity among defendants, all in violation of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1980).

The essence of the settlement under consideration is that it provides class members with cash in the amount of at least $675,-000.00 Dollars, plus, ultimately, through civic associations established in each subdivision, the opportunity to obtain ownership of the recreational facilities, as well as securing potential reductions in the recreation fees assessed against class members. Ten of the subdivisions have already used the framework of the proposed settlement to obtain reductions in rental obligations through buy-outs of recreational facilities

by civic associations. The Settlement Agreement also provides a vehicle whereby individual subdivisions, acting through their representative homeowners associations, could negotiate separate agreements providing for purchase of the recreational facilities and termination of the lease agreements from the defendant-owner. Where, due to the other terms of the general settlement, the economic value of the lease to the lessor had been substantially reduced, the possibility of an outright sale to a homeowners association at a more agreeable price would be enhanced. Ten such buy-outs of recreational facilities by civic associations have already been executed and incorporated into the terms of the overall Settlement Agreement presented to the court for approval.

It is uncontested that the value of the various recreational facilities has risen over time and that the total 1979 assessed value for the facilities was over $3,000,000. Additionally, plaintiffs' expert has calculated the potential cash savings to residents flowing from rental reductions to aggregate in excess of $40,000,000, assuming a three percent inflation assumption; assuming an eight percent inflation rate, the savings would be in excess of $200,000,000. See Affidavit of James B. Edwards, Ph.D., CPA, Docket Entry 1577.

In considering the instant motions the court has received and reviewed Plaintiffs' Memorandum of Points and Authorities in Support of Preliminary Approval of Settlement, Plaintiffs' Preliminary Statement Regarding Draft Settlement, and the Affidavit of James B. Edwards, Ph.D., CPA, concerning economic value of the proposed settlement (plaintiff's expert). The court has also considered 654 objections to the settlement, including two memoranda and supporting documents presented on behalf of Tamarac homeowners by Attorney Joseph H. Fitzsimmons, plus the Objections of Charles and Ida Diamond and the Tamarac Homeowners Association. The court has also reviewed responsive memoranda filed by counsel for the class and by Behring Corporation.

Three hearings have been held concerning the instant proposed settlement. The first was held on July 7, 1980. Preliminary approval of the settlement was withheld pending presentation to the court of an executed Settlement Agreement. The settlement agreement was subsequently modified *inter alia*, (1) to permit the class to collect interest at fifteen per cent in the event defendants withheld cash payments into the settlement fund; (2) to provide an extension of the time period allowed for class members to avail themselves of the benefits of the special taxing district approach made available under Tier I of the agreement; (3) to authorize various Tamarac subdivisions (and class members residing therein) to attempt to negotiate, as part of the overall settlement, buy-out terms acceptable to them and the owner-lessors. As noted above, ten such buy-outs were negotiated. The ten buy-outs are before the court for consideration through ten separate Stipulated Motions for Approval of Separate Agreements for the purchase of recreational facilities as part of the overall settlement. As modified, the settlement agreement was executed and filed with the court on April 3, 1981.

On June 12, 1981, a second hearing regarding preliminary approval of the proposed settlement was held. Not present or represented at the hearing were defendants Jack and Dorothy Najor, George Mercier and Jacob Lutz, all of whom declined to enter into the proposed settlement.

The court subsequently granted preliminary approval of the settlement, approved the proposed notice of settlement to the class and authorized dissemination of the notice of settlement and of the settlement agreement.

On September 25, 1981, the court held a hearing at which all interested parties were permitted to present their views concerning the settlement. Class counsel presented testimony concerning the fairness, adequacy and reasonableness of the settlement from Mr. Jeffrey Streitfeld, an expert in the field of Florida recreation lease litigation. Mr. Streitfeld spoke in favor of the

settlement, and his comments are discussed in some detail below. Additionally, the court has reviewed affidavits verifying dissemination of the class action notice pursuant to the court's order of July 10, 1981, together with an affidavit verifying dissemination throughout Tamarac of the class action settlement agreement pursuant to the terms of the Notice of Class Action approved by this court.

## STANDARDS FOR DECISION GOVERNING APPROVAL OF A CLASS ACTION SETTLEMENT

The Fifth Circuit Court of Appeals has provided explicit guidance as to the factors which must be considered by a district court judge in deciding whether to approve or disapprove a class action settlement. Three general propositions are of universal application. First, it has been repeatedly recognized that settlements are " 'highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits.' " *Miller v. Rep. Nat. Life Ins. Co.,* 559 F.2d 426, 428 (5th Cir.1977) (citations omitted). Second,

> [i]n class actions this policy must be coupled with the two-fold requirement that (1) there is no fraud or collusion in arriving at the settlement and (2) the settlement is fair, adequate and reasonable.

*Id.* at 428–29 (citations omitted). Third, although approval of a settlement is a matter left to the court's discretion, "[I]t is essential that the trial judge support his conclusions by memorandum opinion or otherwise in the record," so that in the event of an appeal, the appellate court will have an adequate basis upon which to determine whether there has been an abuse of discretion. *Id.* at 1330; *see, also, Protective Committee v. Anderson,* 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968); *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 213 (5th Cir.1981) (hereinafter "Corrugated Cases"); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977).

■ A number of factors have been identified as bearing upon the fairness, adequacy and reasonableness of a proposed settlement. The Court considers the following to be of relevance in this case:

(1) the likelihood of success at trial. *See Corrugated Cases, supra,* 643 F.2d at 212.

(2) "[a] range of possible recovery that plaintiffs would realize if they prevailed at trial". *Id.*

(3) "[t]he point on, or if appropriate, below the range of possible recovery at which a settlement is fair and adequate". *Id.*

(4) The complexity, expense and duration of litigation. *Id.* at 217, *citing City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974).

(5) The substance and the amount of opposition to the settlement. *Cotton v. Hinton, supra,* 559 F.2d at 1331.

(6) The stage of the proceedings at which the settlement was achieved. *Corrugated Cases, supra,* 643 F.2d at 217.

Application of the above factors and policies to this case leads the court to conclude that the proposed settlement is fair, reasonable and adequate and should be approved.

## ABSENCE OF COLLUSION

■ The Court has reviewed the record and has found no evidence nor the slightest hint of collusion between the parties or their attorneys in arriving at the terms of this settlement. The available evidence indicates that plaintiffs' first settlement offer in 1979 was rejected; that defendants' counteroffer of settlement in 1979 was rejected by plaintiffs; and that it was only after plaintiffs had obtained denials of several key defense motions, had filed several motions of their own, had vigorously pursued discovery, and had moved for a trial date, that defendants returned to the bargaining table. Indeed, the settlement which plaintiffs were eventually able to exact was more favorable than the one they originally offered. Furthermore, four defendants have elected not to settle. Accordingly, the court finds that the settlement was achieved in good faith, by arms length negotiation, and without collusion.

## THE LIKELIHOOD OF SUCCESS AT TRIAL

Prior to the hearing on preliminary approval, plaintiffs' attorneys filed a detailed Memorandum of Points and Authorities in Support of Preliminary Approval of Settlement. (Docket No. 1576). In that memorandum, plaintiffs' counsel presented their frank, objective assessment of the myriad of factual and legal problems which inhere in litigation of this nature. While stating their good faith belief that there was a possibility of prevailing at trial, plaintiffs' counsel concluded that the uncertainties warranted submitting the settlement to the class.

In addition to the appraisal of plaintiffs' attorneys, the court has had the benefit of the testimony of Jeffrey Streitfeld, an expert on class action condominium litigation. Mr. Streitfeld's credentials as an expert and professional qualifications are well known to this court. In Mr. Streitfeld's opinion, the probability of succeeding on the merits in cases of this nature is normally less than 50–50 and in a case of this complexity, well below 50–50. Mr. Streitfeld also testified that he did not believe a case of this complexity could be understood by a jury.

Counsel for the defendants, while recognizing the vagaries and risks of jury trial, appraised the chances of success as very low.

> This Court is entitled, in evaluating a settlement, to rely upon the judgment of experienced counsel for the parties ... [and] should be hesitant to substitute its own judgment for that of counsel.

*Cotton v. Hinton, supra,* 559 F.2d at 1330, citing, *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975).

The court has concluded that for plaintiffs to prevail, they must overcome such significant factual and legal obstacles that the probability of their success becomes problematical.

First, this case is essentially a tying case, hence the first two obstacles which plaintiffs face are the elements of "two separate products" and "sufficient economic power". The court is aware of two South Florida condominium cases in which juries have returned defense verdicts as to these elements. In *Levinson v. Maison Grande, Inc.,* 517 F.Supp. 963 (S.D.Fla.1981), the trial judge let stand the jury's finding that defendants lacked economic power in the relevant market. In addition, the judge determined that residential real estate was not sufficiently unique to create a presumption of economic power, and that a condominium and its contiguous recreation areas do not constitute two separate products. This latter finding was duplicated by a jury in the unreported case of *Perry v. Monterey Development Co.,* Case No. 78–8172–CIV–CA (S.D.Fla., Jan. 7, 1980). *See, also, Foster v. West Alexandria Properties, Inc.,* 1980 Trade Cases, Para. 63,223 (E.D.Va. 1980). A further problem associated with plaintiffs' tying claim is that plaintiffs may experience difficulty in defining a tied product market in which defendants face competition. Defendants contend that the alleged tied products in this case, the recreational facilities, are unique and have no competition. In the absence of competing facilities, there can be no foreclosure of competition. Failure to establish such foreclosure may warrant denial of plaintiffs' claims. *See Driskill v. Dallas Cowboys Football Club, Inc.,* 498 F.2d 321 (5th Cir. 1974); *Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286 (2d Cir.), *cert. denied,* 419 U.S. 1022 (1974).

Second, as explained in more detail later, this court believes Plaintiffs will face another serious obstacle in establishing and proving damages.

Third, as we have seen, this type of litigation has fared quite poorly in the courts. The court is unaware of a single favorable plaintiff's verdict, although there are at least two clear-cut defeats. *See, Perry v. Monterey Development Co., supra; Levinson v. Maison Grande, Inc., supra.*

Furthermore, most significantly, and as plaintiffs' counsel have pointed out in their preliminary approval memorandum, the Federal Trade Commission, after investigating Tamarac, declined to bring a com-

plaint; and the Antitrust Division of the United States Department of Justice has issued an opinion that recreational tie-ins do not violate the Sherman Act. This constitutes compelling evidence of the possible weakness of plaintiffs' claim.

For these reasons, the court concludes that the likelihood of success on the merits in this case is very low. It would seem unwise, therefore, to risk the substantial benefits which the settlement confers upon the class to the vagaries of a trial.

## RANGE OF POSSIBLE RECOVERY FOLLOWING A SUCCESSFUL TRIAL

Prior to discussing damages, it should be noted that the primary goal of plaintiffs has always been to obtain a ruling declaring the recreational leases illegal and unenforceable.

Damages have been prayed for, however, thereby creating some very perplexing problems for the parties and the court. For example, not only is there great uncertainty as to the fact and amount of damage, but also as to the correct measure of damages to be applied.

This court has previously determined that plaintiffs' fraudulent concealment allegations are without merit hence the damage period runs from June 6, 1972. *See* Order dated October 5, 1978, Docket No. 557.

Plaintiffs have contended that they are entitled to recover the full amount of all payments made on the recreation leases, however, the normal measure of damages in a tie-in case has been stated to be the amount by which the plaintiffs have been overcharged for the tied product. *See, generally,* Comment, *Private Enforcement of Antitrust Laws: Damages Recoverable from Illegal Tying Arrangements,* 78 Dick. L.Rev. 305, 314–19 (1973); C. Hills, *Anti-*

*trust Adviser* Sec. 11.36 at 765 (2d ed. 1978). Defendants on the other hand have suggested that in considering damages, the court must also take into consideration the price of the single family homes, the alleged tying product. Defendants contend that the income stream provided by the recreation leases enabled the single family homes herein to be sold at prices lower than those of comparable single family homes without recreation leases.

▮ For purposes of evaluating this settlement only, the court concludes that overcharges on the tied products alone constitutes the most reasonable approach to measuring damages.[1]

Plaintiffs also contend that they are entitled to recover for any diminution in the value of their residential real estate caused by the recreational tie-in.

Assuming that use of the recreational facilities had no value, the most that could be recovered is the total amount of payments made in all subdivisions since June of 1972. The evidence might show that a reasonable charge for equivalent facilities would be in excess of $13.00 per month. If so, only class members residing in subdivisions in which payments are subject to cost of living escalator clauses could be damaged since the highest rent in the nonescalator subdivision is $13.00.

Finally, if no comparable facilities exist, then it might not be possible to compute an overcharge.

Only by assuming that use of the recreational facilities has no value whatsoever could a substantial damage figure of approximately $12,000,000.00 Dollars[2] untrebled be reached. Such a damage computation is not consistent with the case law in this area. Furthermore the record reflects use of the facilities by members of the class, hence, the court cannot consider such a

---

1. The Court emphasizes that this conclusion regarding the measurement of damages, and all conclusions reached herein, are reached in the context of consideration of the fairness, reasonableness and adequacy of the settlement and do not constitute findings of fact or law on the substantive issues presented in the litigation.

2. Derived by taking 6,000 (approximate number of homeowners excluding opt-outs) × $20 (approximate average monthly charge) × 112 months (months from June 6, 1972, to date).

damage computation as reasonable in this action.

The unique nature of recreational facilities contained within a residential subdivision and limited to the exclusive use of the residents of that subdivision also raises the possibility that no comparable market exists and that, accordingly, no computation of damages could be reached.

An additional problem with respect to the assessment of damages is presented by the fact that all of the subdivisions were not developed at the same time but rather the project extended over a period of years. This could and probably would affect the damages as to each separate subdivision since the value of the tied product, the recreational facilities, would vary depending upon the market and economic conditions prevailing at the time of the respective sales and the physical location of the various properties.

The "possible range" on untrebled damages is $0 to $12,000,000.00, but based upon the evidence in the record, the substantial likelihood is that the "possible range" of untrebled damages is $0 to a questionably ascertained amount.

## THE POINT ON OR BELOW THE RANGE OF POSSIBLE RECOVERY AT WHICH A SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE

For the foregoing reasons, the settlement fund of $675,000.00 may amount to a windfall for the class. Several attorneys who have addressed the court concerning this settlement have noted that this is the first case of this type in which such a fund has been established. Even in the absence of the fund, however, the court would still be inclined to approve the settlement.

The benefits to the class from the settlement will be substantial. Should Plaintiffs lose at trial, and the prospects thereof have been discussed, the leases would run their courses unhindered which could prove extremely harmful in the light of our recent experience with inflation.

Again as noted, there is a low probability that damages can be satisfactorily established in this case. As previously stated, the court has concluded that the overcharges on the tied product constitute the appropriate measure of damages for purposes of evaluating this settlement. For an overcharge to exist, however, there must, by definition, be a lower price at which the tied products are available. The problem arises in selecting which products compete in the same market as defendants' recreational facilities.

Defendant owner-lessors have been charging net rental of anywhere from $10.00 to $40.46 a month for defendants' recreational facilities. Possible substitutes, if they exist, will not be free. Depending upon which products are included in the market, some or all of the plaintiffs may be unable to claim overcharge damages.

If defendants' recreational parcels are found to be unique, and thus without competition, the only way plaintiffs could demonstrate injury would be by showing that in the absence of the tie-in, defendants would have charged a lower price for the facilities. Because the recreational facilities have never operated in an environment in which they faced direct competition, it would be extremely difficult to demonstrate what rates would otherwise have been charged.

A recent case in this district suggests that injury can only be shown in a tie-in case by establishing that plaintiffs were overcharged for the package consisting of tied and tying products. *Kypta v. McDonald's Corporation,* 1980–1 Trade Cases Para. 63,267 (S.D.Fla.1980). If *Kypta* is a correct statement of the law, additional issues arise which could defy calculation of an overcharge. According to their sales contracts with Tamarac's developer, the contract price for Mr. and Mrs. Bennett's home, built in 1967–68, was $16,070.00. Mr. Wagner's home, built in 1969, had a contract price of $22,885.00. There is some evidence which suggests that homes which were subject to recreational leases were sold by their builders during the years 1969–75 for significantly less than similar

property not so encumbered. *See* J.R. Lewis, *The Condominium Recreational Lease Problem,* 10 Real Estate Review 99, 103 (Spring 1980). Accordingly, if the prices of tied and tying products must be aggregated, further questions concerning the extent of plaintiffs' injuries are created, particularly in those Tamarac subdivisions not subject to an escalator clause.

In view of the serious uncertainties which exist on the liability issues, the total absence of trial success in cases of this nature and the legal and factual obstacles to the proof of damages, the "possible" recovery in this case becomes highly speculative. These considerations all indicate that the proposed settlement should be approved.

### THE COMPLEXITY, EXPENSE AND DURATION OF LITIGATION

This case is now approaching its tenth year on the docket of this Court. It has already been the subject of two Fifth Circuit opinions. *See Bennett v. Behring Corp.,* 525 F.2d 1202 (5th Cir.), *cert. den.* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 798 (1976), and 629 F.2d 393 (5th Cir.1980). The legal and factual issues are both numerous and complex. To date, the costs of litigation for plaintiffs alone amount to close to $50,000.00, much of it advanced by class counsel. Plaintiffs estimate that a similar amount may be required to complete preparation for trial and to try the case. Mr. Streitfeld, plaintiffs' expert, estimated that several weeks of court time may be required for trial. The Court believes a minimum of eight weeks of trial time would be required if all defendants went to trial. Mr. Streitfeld testified that this case is far more complex than the normal recreational tie-in case, and expressed doubt as to whether it was possible to successfully try a case of this complexity to a jury. As far as expected duration is concerned, this case will likely last three to five more years, assuming no mistrials and resultant retrials and assuming final determination on appeal with no remands for new trial and subsequent appeals.

It follows, therefore, that the complexity, expense and duration of this litigation are factors which support approval of the proposed settlement.

### THE SUBSTANCE AND THE AMOUNT OF OPPOSITION TO THE SETTLEMENT

Between 600 and 700 individual objections to the proposed settlement have been submitted to the court. All but a handful were identical form letter objections criticizing the notice of settlement approved by the court. The form letter objections also sought to incorporate by reference objections advanced by another unidentified objector.

██ Two objections, those filed by attorney Joseph Fitzsimmons, were generally based upon state law legal arguments, some of which have been previously rejected by this Court. *See* Docket Numbers 1658–59.

A lengthy objection was filed on behalf of class members Charles and Ida Diamond and on behalf of the Tamarac Homeowners Association. *See* docket number 1650. The state law claims advanced are irrelevant to Amended Count VII, which states a federal antitrust claim.

Finally, there were other written objections which merely expressed a misunderstanding of the terms of the settlement or opined that the terms could be better. Responses to these objections were filed by class counsel and Behring Corporation.

Of importance is the fact that the court did not receive a single objection directed to the merits of the proposed settlement. None of the objectors submitted any evidence of any nature which would tend to show that the terms of the settlement are not beneficial to the class, that class counsel's appraisal of the risks of litigation is erroneous, or that there has been collusion in arriving at the settlement. Nor have the objectors submitted any evidence indicating a possible range of recovery at trial.

While the court believes that none of the objections have any legal or factual merit, it does recognize a duty to explain its reasons for rejecting them.

### 1. The Amount of Opposition

 The court is not free to disregard the fact that 600 to 700 class members have expressed opposition to the settlement. Certain objectors suggest that one of the three named class representatives, Mr. Wagner, now opposes the settlement.

While recognizing that the number of objectors is a factor to be considered in approving the settlement, it is not a controlling factor in that "a settlement can be fair notwithstanding a large number of class members who oppose it". *Cotton v. Hinton, supra,* 559 F.2d at 1331. Indeed, in *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), a class action settlement was approved despite the fact that 22 percent of the class actively objected to it. In this case, the number of objectors amounts to less than ten percent of the class.

Accordingly, in view of the resolution of the other issues bearing on the fairness, adequacy and reasonableness of the settlement, in view of the recommendations of counsel, and in view of the absence of evidence which would detract from the fairness of the settlement, the number of objections presented is insufficient to mandate that the settlement not be approved.

 As to the effect of the possible recalcitrance of one named class representative one need look no further than *Saylor v. Lindsley,* 456 F.2d 896 (2d Cir.1972) where it was held that opposition by a named plaintiff is not a sufficient reason to disapprove a settlement. As the Second Circuit explained,

> A contrary view would put too much power in a wishful thinker or a spitemonger to thwart a result that is in the best interests of the [class].

*Id.* at 898–99. Moreover, it is not disputed that two of the three named plaintiffs do endorse the settlement. Since unanimity is not required, opposition by a single named plaintiff is, by itself, insufficient to require disapproval of the settlement. *In re General Motors Corp. Engine Interchange Litiga-*

*tion,* 594 F.2d 1106 (7th Cir.1979), *cert. denied* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1980).

While it is unclear if one of the named plaintiffs does indeed oppose the settlement, nevertheless and even assuming such opposition, such does not form a basis for disapproving the settlement.

### 2. Objections to the Notice of Settlement

 Objections were raised to the notice of settlement. It has been argued that the notice was defective because it failed to inform the class that one of the named plaintiffs allegedly opposed the settlement. Even if this is correct, the Fifth Circuit has ruled that failure to include such information does not render the notice inadequate, nor does it constitute an abuse of discretion. *See Corrugated Cases, supra,* 643 F.2d at 224.

 Secondly, the first ground set forth in the form objections submitted to the court was that the objectors allegedly did not understand the notice. It is not the function of the settlement notice to fully inform the class of all of the details of the settlement, but merely to put class members on notice of the general parameters of the settlement and to inform them of where information as to the specifics may be obtained. *Grunin v. International House of Pancakes,* 513 F.2d 114, 122 (8th Cir.1975), *cert. denied* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The notice in this case was as clear as the circumstances would permit. It specifically provided therein that copies of the complete settlement agreement with attachments be provided to each of the subdivisions affected thereby, and the court has received an affidavit attesting this was done. Finally, it is significant that none of the form objectors specified which portions of the notice were not understood, nor was it explained why reference to the full agreement could not cure the objections. The form objectors have failed to point to a single feature of the settlement agreement which they considered vague.

The form objectors also object that the notice is erroneous and misleading because it conveys the impression that there is a substantial likelihood of losing the lawsuit. The authorities brought to the court's attention, and the opinions of counsel indicate that, in fact, the probability of success on the merits is very low. The objectors have failed to cite a single case which would warrant a contrary conclusion. The court finds that the notice fairly and accurately assesses the litigation problems confronting the class, and thus this objection is without merit.

The form objectors also complain that undue reference is made to claims which have been dismissed. There is no undue reference to those claims. The reference which was made was necessary in order to fully inform the class as to the status of this litigation, since settlement of this case will cause class members to forego testing the court's prior summary judgment order on appeal.

Objection is also made that the notice does not plainly state that class members have a right to a *jury* trial. Initially, we note that all form objectors knew of that right, as evidenced by their objections, hence prejudice is lacking. Moreover, the notice makes clear that the alternative to settlement is trial on the merits. Information as to the type of trial (jury or non-jury) is not a relevant consideration to a class member in deciding whether to approve or disapprove the terms of the settlement.

The final objection to the notice is its failure to provide specific information as to fees. This objection is refuted by the face of the notice itself. Paragraph 18 of the notice states that plaintiffs' attorneys are seeking $375,000.00 in fees for over 3,000 hours of attorney time and reimbursement of costs in the amount of $40,000.00. The notice also informs the class that class counsel's fee petition is on file with the Court.

For the foregoing reasons, all objections to the class notice are without merit.

## OBJECTIONS RAISED ON BEHALF OF CHARLES AND IDA DIAMOND AND THE TAMARAC HOMEOWNERS ASSOCIATION

This court has reviewed the lengthy written objections submitted in behalf of the Diamonds and the Tamarac Homeowners Association and has heard oral argument by their attorney. The court finds each of the purported objections without merit.

These objectors complain that approval of the settlement would violate the antitrust laws by perpetuating an illegal agreement. In view of the substantial dispute which exists as to the legality of the recreational tie-ins, this contention must be rejected. Furthermore it begs the question. As the Eighth Circuit clearly held in *Grunin v. International House of Pancakes, supra,* unless the illegality of the arrangement under consideration is a "legal certainty," the mere fact that certain of its features may be perpetuated is no bar to approval. Moreover, this objection ignores the fact that the settlement provides an opportunity to terminate the existing situation by permitting the class members themselves to acquire title to the recreational facilities through either future recreation districts or through their representative homeowners associations.

The Diamond-Tamarac objectors also complain that the settlement fund represents only a small percentage of the actual damages sustained by the class. This is a bare conclusion. It is unsupported by legal authority as to the measure, fact and amount of damages. Objector's reliance on *Liebman v. J.W. Petersen Coal & Oil Co.,* 73 F.R.D. 531 (1973) is misplaced. In *Liebman* the likelihood of success both on liability and damages was high.

These objectors attempt to argue that this settlement is precluded by portions of the Florida condominium laws which objectors say require 100 percent approval of homeowners in a subdivision in order for the subdivision to contract to purchase its recreation facility from the owner. This argument must be rejected for a number of reasons. First, this is a settlement agree-

ment governing a case brought under the federal antitrust laws—*not* a contract of purchase and sale—and hence Federal Rule of Civil Procedure 23(e) controls. Second, the settlement agreement does not provide for the forced purchase of property. Under Tier I a statutorily created procedure setting up recreational districts is utilized. *See* Fla.Laws 1978, c. 78–273, codified, F.S. §§ 418.20–418.26. Homeowners will make substantially reduced payments over a reduced term, but will not be purchasing the facilities. Tier II contemplates only a modification of existing leases, upon expiration of the terms of which ownership of the facilities may be relinquished to the homeowners association.

 Finally and most importantly and as this Court has previously emphasized, this is *not* a condominium case. *Bennett v. Behring Corporation,* 466 F.Supp. 689 (S.D. Fla.1979). Class members are owners of single family detached dwellings and are thus, by definition, excluded from coverage of the Florida condominium laws.

At oral argument objectors' counsel contended that class members were being forced to purchase property against their wills in violation of the due process and equal protection clauses of the state and federal constitutions. This argument proceeds from a false premise. None of the provisions of the agreement operates to vest ownership of the property in class members. Contrary to objectors' conclusion, no class member will take title to any of the property conveyed. Ownership will be in either a recreational taxing district (Tier I), a homeowners association (Tier II), or will remain with the owner-lessor in the event that the homeowners association does not accept title.

Objectors have also charged class counsel with unethical conduct and with disregarding the interests of class members. This contention is without merit as previously noted.

Each of the respective objections of the Diamonds and Tamarac Homeowners Association are, therefore, without merit.

## OBJECTIONS OF CLASS MEMBERS DUNNE, LAURENCE, *et al.*

The objections of certain class members (Dunne, Laurence, *et al.*) made by attorney Joseph A. Fitzsimmons, are legal arguments based on equitable conversion, Florida homestead rights and fraud. These contentions have been decided by this court unfavorably to the class. *See Bennett v. Behring Corp.,* 466 F.Supp. 689 (S.D.Fla.1979). In any event, those claims are not found in Amended Count VII, the federal antitrust claim. Furthermore, the claims under state law asserted by Mr. Fitzsimmons have previously been litigated and rejected by the Supreme Court of Florida. *See Bessemer v. Gersten,* 381 So.2d 1344 (1980).

Mr. Fitzsimmons suggested during oral argument that a number of subdivisions have recreation leases which allegedly provide that homeowners may cease paying for use of the facilities at some early date. Mr. Fitzsimmons appears to make reference to clauses such as Paragraph 12 of the Declarations of Restrictions for the Tamarac Lakes South Subdivision, a copy of which was filed as an Exhibit to the Objections of Mr. and Mrs. John Dunne, Docket Entry 1658. That paragraph provides in part that the covenants, restrictions, reservations and servitudes are binding on all residents of the subdivision until July 1, 1968 "*(except as elsewhere herein expressly provided otherwise)."* Paragraph 12 must, therefore, be read in conjunction with the other paragraphs of the agreement, such as paragraphs 6 and 7 which impose on homeowners the costs of maintaining the recreational facility and the net rental obligation. Paragraph 7 provides in part that:

> The provisions of this Paragraph 7 and of Paragraph 6 above shall remain in effect and shall be considered and construed as covenants, restrictions, reservations and servitudes running with the land and the same shall bind all persons claiming ownership or use of any portion of said lands until the first day of July, A.D. 2016.

Mr. Fitzsimmons' objection is simply based on an erroneous reading of the Restrictions. The Restrictions applicable to

Tamarac Lakes South do not unequivocally grant homeowners freedom from recreational facility maintenance or rental charges prior to expiration of the lease in 2016. Even if this contention is correct, nothing in the settlement agreement attempts to alter any Declaration of Restrictions provision.

Accordingly, the Court must reject the objections made on behalf of objectors Dunne, Laurence, et al.

## STAGE OF PROCEEDINGS

As mentioned, this case is nearing its tenth year of litigation. During that span it has been to the Fifth Circuit for two decisions and to the Supreme Court once.[3] There have been nearly 1,700 docket entries. Discovery by both sides has been thorough and extensive. Most of the numerous legal issues have been revealed and litigated through a plethora of motions and memoranda filed under Rules 12, 23, 37 and 56. In short, the record provides an ample basis from which to evaluate a proposed settlement.

Although there are numerous objectors, the court also notes the existence of substantial sentiment in favor of the settlement. In the ten (10) Tamarac subdivisions which are the subject of the pending Stipulated Motions for. Approval of Separate Agreements as part of the overall settlement, the agreements have been overwhelmingly endorsed by the residents as follows:

| Subdivision | Vote of Civic Association Board | | Vote of Subdivision Residents | |
|---|---|---|---|---|
| | For | Against | For | Against |
| Woodlands 1 | 13 | 0 | 156 | 1 |
| Woodlands 2 | 14 | 0 | 72 | 0 |
| Woodlands 5 | 11 | 0 | 101 | 0 |
| Woodlands 6 | 7 | 0* | 105 | 0 |
| Woodlands 7 | 12 | 0 | 162 | 0 |
| Woodlands 8 | 14 | 0 | 90 | 0 |
| Mainlands 8 | 8 | 0 | 287 | 2 |
| Mainlands 9 | 9 | 0* | 26 | 7 |
| Mainlands 12 | 10 | 0 | 211 | 8 |
| Vanguard Village | 9 | 0 | 215 | 5 |
| TOTAL | 107 | 0 | 1425 | 23 |

\* 1 Abstention

Obviously, there is substantial support for the Settlement Agreement and the buy-outs it has already fostered in Tamarac.

## CONCLUSION

In sum, the court has determined that the settlement has been achieved in good faith through arms-length negotiations and is not the product of collusion between the parties and/or their attorneys. There is no evidence of unethical behavior, want of skill or lack of zeal on the part of class counsel. The settlement provides significant cash and other tangible benefits to the class and objectors have submitted no evidence suggesting a contrary conclusion. The probability of success on the merits is low both as to liability and damages, and is certainly less than 50–50. The range of possible recovery is zero to $12,000,000. The settlement fund of $675,000.00 is a fair and adequate sum, in view of the risks of further litigation and the fact that damages are not the primary goal of this lawsuit. Moreover, the settlement yields class members substantial cash savings and the amount of opposition to the settlement is insufficient to warrant disapproval. The objections which have been raised are legally insufficient to require disapproval, and the objectors' evidence supports class counsels' opinions as to the reasonableness of the settlement, and there exists an adequate basis on the record from which to evaluate the settlement. All of the foregoing considered, the court finds that the settlement is fair, adequate and reasonable and that approval is in the best interests of the class. It is therefore

## ORDERED AND ADJUDGED that

1. Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Agreement of Compromise and Settlement, including the separate buy-outs incorporated therein as set forth in the Stipulated Motions for Ap-

---

**3.** See Bennett v. Behring Corp., 525 F.2d 1202 (5th Cir.), cert. denied 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 798 (1976) (appeal of Behring Corporation regarding class action determination dismissed on ground order entered by dis-trict court is not an appealable order); Bennett v. Behring Corporation, 629 F.2d 393 (5th Cir. 1980) (appeal of Behring Corporation regarding content of class action notice dismissed for lack of appealable order).

proval of Separate Agreement for Purchases of Recreational Leases be, and hereby is, APPROVED;

2. This opinion and order shall constitute the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a);

3. All parties to this agreement shall bear their own costs unless otherwise provided for in the Settlement Agreement;

4. The terms of the Agreement of Compromise and Settlement are hereby incorporated into this Order and the plaintiffs, the class and all defendants shall fully perform their obligations under the Agreement of Compromise and Settlement and use their best efforts to cause all other persons to perform any acts and execute such documents as necessary or appropriate to satisfy the terms, covenants and conditions of the Agreement of Compromise and Settlement;

5. The court shall retain continuing jurisdiction to enforce and administer the Settlement Agreement.

6. The accounting firm of Arthur Anderson and Company, or another nationally recognized accounting firm, shall be appointed Trustee of the Settlement Fund, with authority to invest the Fund and to make disbursements therefrom.

7. The Trustee of the Fund is to make the following disbursements in the following order:

(a) for attorneys fees to class counsel in an amount to be determined by this Court;

(b) for costs and expenses advanced by class counsel in an amount to be determined by this Court;

(c) for such other costs in the amounts and to such parties as determined by the Court;

(d) for costs as they accrue in litigating the remainder of this case against non-settling defendants;

(e) for such other purposes as provided by the Settlement Agreement.

8. This case is hereby dismissed as to the settling defendants in its entirety and with prejudice to plaintiffs and the class.

9. A partial final judgment dismissing this case shall be entered and this court expressly determines that there is no just reason for delay. The partial final judgment shall contain the legal descriptions of the thirty-one (31) subdivisions affected by this Order and shall be recorded amongst the Public Records of Broward County, Florida, so that all purchasers of single family residences in the subdivisions affected by this action shall be on notice of the terms and conditions of the Agreement of Compromise and Settlement approved hereby.